IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

SUN WATER SYSTEMS, INC,      §
ET AL.                       §
                             §      CIVIL ACTION NO.4:05-CV-574-Y
VS.                          §
                             §
VITASALUS, INC., ET AL.      §

ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The Court has before it Plaintiffs' motion requesting that the
Court preliminarily enjoin Defendants from using certain trademarks
and trade dress in conjunction with the design and labeling of a
whole-house water-filtration system (doc. #27).  Plaintiffs filed the
above-styled and -numbered case alleging trademark and trade-dress
infringement, unfair competition, and trademark dilution.  The crux of
the dispute between the parties involves the use of certain trademarks
and trade dress in the marketing and sale of a whole-house water-
filtration system (hereinafter "whole-house system") that the parties
sell to the public.  After review of all the pleadings and appendices
regarding Plaintiffs' motion for preliminary injunction, the Court
concludes that it should be DENIED.


I.   FACTUAL BACKGROUND

In 1988, plaintiff Charles Strand ("Strand") and a partner formed
the International Purity Corporation ("IPC") to manufacture various
water-filtration systems.  One of the systems IPC manufactured was a
"point-of-entry" water-treatment system also known as a whole-house
system.  The point-of-entry system filters water at the place water
enters a home from a municipal water supply.  It attaches to the

plumbing of a home and filters all of the water entering the home from a municipal treatment facility.

The whole-house system contains two tanks in a "stacked tank design." This design serves a particular function. The water enters the system through a coupling that connects the two stacked tanks. The coupling directs the water upward into the top tank where it is filtered using a particular type of media designed to separate out certain perceived undesirable inorganic elements. That media is more efficient when the water filters through it in an upward direction. The water then flows downward into the bottom tank where the water continues to be filtered using different mediae designed to separate out more chemicals and organic elements. Those mediae are more efficient when the water filters through them in a downward direction. The two tanks are painted dark blue and, again, are connected by a gray-colored coupling. The top of the pre-filter is light blue and the shut-off valve to the unit has a bright-orange handle. The bottom tank sits in a black plastic base.

IPC called this system the "Rhino Whole House Water Treatment System" or the "Rhino Deluxe Whole House Water Treatment System." In a single-page informational brochure, IPC explained how the Rhino system functions and how its unique design made it superior to other water filtration products. The brochure also contained the following diagram illustrating how the whole-house system functions:

2



**Diagram A**

IPC filed an application with the United States Patent and Trademark Office ("USPTO") to register the word mark "Rhino" as its trademark for "domestic water filtering units." In the application, IPC stated that the "Rhino" trademark was first used in commerce in 1992. The USPTO approved the application and registered the trademark in 1993. IPC assigned the Rhino trademark to Equinox International Corporation ("EIC") in 1996, and recorded that assignment at the USPTO in 1997.

Previously, in 1991, Strand's partner sold his interest in IPC to the owner of EIC. IPC became the exclusive manufacturer of all water-

3

filtration systems EIC sold from approximately 1991 until 2000.   The first whole-house systems IPC manufactured for EIC were affixed with two labels on the top blue tank of the system.   The upper label was white with an approximately one-inch vertical red bar on both ends of the label.   The white label stated, in blue lettering, "Rhino High Efficiency Water Treatment System by International Purity Corporation," and contained a solid-blue clip art of a rhinoceros.   Lettered in white on the red vertical bars was the legend, "A Product Of International Purity Corporation."   The lower label contained the IPC official logo and the words, "International Purity Corporation." Follow-                                                                                      ing are illus-                                                                                        tration s of                                                                                            those labels.



**Diagram B**



**Diagram C**

The bottom tank contained a smaller and less noticeable square white label that identified the system as "Model: EQ-300 Whole House Water Filtration System."   In the bottom right-hand corner of the label was the name "Equinox International Corporation" along with the corporation's address.   Following is an illustration of that label.



**Diagram D**

Diagram E illustrates the placement of the three labels.



**Diagram E**

By 1994 the labels changed, and two new labels were affixed to the top blue tank.  The upper label was gold and in black lettering stated: "Rhino High Efficiency Water Treatment System by Equinox."  It contained a solid-white clip art of a rhinoceros.  The lower label contained the EIC logo.  This logo contained a blue and gold, partially shaded meridian globe with gold parallel lines running horizontally and vertically, and a gold representation of a sun and a full moon.  Underneath the logo was the word "Equinox" in black lettering.  There no longer contained any reference to IPC and the IPC logo no longer appeared on the system.  EIC registered this logo with the USPTO in 1993, and stated it was first used in commerce in 1992. The USPTO cancelled the registration in 2003.  The following illus-trates of those labels.



**Diagram F**

But by 1995, the upper label changed again.  The new label was gold with a black outline around the edge of the label.  In black lettering it stated, "Equinox EQ-300 Whole House Water Treatment System."  The lower label retained the EIC logo with the word "Equinox."  Like the prior labels, these labels were affixed to the top blue tank.  Following illustrates that label.

7



**Diagram G**

The word mark "Rhino" no longer appeared on the label and there no longer contained any depiction of a rhinoceros. In fact, the new label changed the name of the whole-house system from the "Rhino High Efficiency Water Treatment System" to the "Equinox EQ-300 Whole House Water Treatment System." And there is no evidence that EIC or IPC ever used the trademark Rhino or a depiction of a rhinoceros in connection with the marketing or sale of the whole-house system again.

In November 1999, the chief financial officer for EIC submitted the following declaration to the USPTO regarding its use of the Rhino registered trademark:

> The mark RHINO is presently not in use as this mark is used as a private label for domestic water filtering units. The mark was acquired by [EIC]

8

> in 1997 from the original applicant [IPC].  This
> applicant continues to be the manufacturer of the
> goods for the registrant.  Presently, all goods
> manufactured bear another of the registrant's
> mark, and there is no present capacity to produce
> additional units under a private label mark.
> Registrant does intend to use the RHINO mark once
> capacity for production can be increased, or if
> demand for the product under registrants' [sic]
> primary mark lessens, allowing for marking and
> sale of private labeled products.

The Rhino trademark registration expired in August 2004.

EIC registered "Equinox International Corporation" with the USPTO in 1996 as its trademark for "distributorships featuring a full line of environmentally safe products."  The USPTO canceled that mark in 2003.  In 1993, EIC also registered the word mark "Equinox," when used together with EIC's official logo, as its trademark for "domestic and commercial water and air filtration systems."  There is no evidence that EIC ever attempted to register the mark "EQ-300" as its trademark for the whole-house system.

In 1998, EIC bought Strand's interest in IPC.  Thereafter, IPC became a totally owned subsidiary of EIC and continued to operate as a distinct corporation manufacturing EIC's water-filtration systems. EIC continued to market and sell its whole-house system using the same design and the trademarks Equinox and EQ-300.

In 1999, the Federal Trade Commission ("FTC") and several states filed suit in federal court alleging that EIC and its subsidiaries engaged in various deceptive trade practices including, among other things, operating an illegal pyramid scheme.  As a result of the suit, EIC and its subsidiaries were placed into permanent receivership in

9

April 2000.   The receiver was directed to liquidate all of the assets and prepare EIC and its subsidiaries for dissolution.   Moreover, the receiver was prohibited from conveying "any proprietary rights to the names "Equinox" or "Equinox International Corporation."

Shortly after EIC went into receivership, Defendants and former EIC distributors John Cloutier, David Kircos, and Robert Cloutier formed Equinox Products L.L.C. ("Equinox Products") and opened an internet website[1] for the marketing and sale of various products including the Equinox EQ-300 whole-house system.

Beginning in April 2000, Equinox Products began marketing and advertising efforts for the Equinox EQ-300.   This included using written sales materials, emails, faxes, and the verbal use of the trademarks Rhino, Equinox, and EQ-300.   Then, in June 2000, Equinox Products began selling liquidated and remaining EIC whole-house system inventories on-line throughout the country.   These whole-house systems contained either the "Rhino High Efficiency Water Treatment System by Equinox" label or the "Equinox EQ-300 Whole House Water Treatment System" label as well as the Equinox logo label as shown above.

By late 2000, the EIC receiver placed an internet hyperlink to Equinox Products's website on the receiver's official webpage[2] advising:

---

[1] http://www.equinox-products.com

[2] http://www.equinoxinternational.com

10

Equinox Products

    If you are interested in purchasing or selling products or accessories previously sold by Equinox International, please visit website http://www.equinox-products.com/.
. . .

Water Filtration Customers

    The supplier/manufacturer for the Equinox Water Filtration Products is no longer in business. We will provide information on other sources of products and/or replacement parts in the future, if they become available.

In 1998, after Strand had sold his remaining interest in IPC to EIC, Strand formed Sun Water Systems, Incorporated ("Sun Water"). Sun Water markets its water-filtration products under the trade name "Aquasana." And in September 2000, Strand began purchasing remaining water-filtration assets of EIC's subsidiary, IPC, through the EIC receiver. These assets included any remaining inventory, component parts, labels, equipment, certifications, boxes, advertising materials, patents, as well as all "allowable trade marks." A year later, in September 2001, Sun Water was assigned all of EIC's rights and ownership in the registered trademark "Rhino."

According to Defendants, in February 2001, and per the recommendation of the EIC receiver, Strand contacted them to sell off his remaining EIC whole-house system inventory. Defendants claim that Strand told them that he "wished to unload his entire EIC liquidated inventory . . . to raise cash for Sun Water/Aqusana's point-of-use . . . water filters." Subsequently, Defendants, as Equinox Products,

11

contracted with Strand, as Sun Water, to purchase the inventory that had been bought from the EIC receiver.

Equinox Products purchased from Sun Water liquidated EIC whole-house systems that were pre-labeled with the EIC logo labels and labels using the trademarks Equinox and EQ-300 but not the Rhino mark or a picture of a rhinoceros. Sun Water sold most of its remaining inventory of EIC liquidated whole-house systems to Equinox Products from February until June 2001. None of the whole-house systems purchased from Sun Water bore any marks of Sun Water or its trade name Aquasana.

During this time, Equinox Products' supply of liquidated EIC whole-house systems became insufficient to meet demand. Realizing that they needed a new manufacturer for the systems, Equinox Products contracted with various companies to produce them, including, in June 2001, Sun Water. Sun Water had a large supply of obsolete Rhino labels, so it began applying them to the new systems. These labels had not been affixed to new whole-house systems in more than six years.

Equinox Products began receiving the newly manufactured systems from Sun Water around July 2001. When it did, it affixed to them an additional white label that read, in black lettering, "Equinox EQ-300." Equinox Products then sold the systems to the public bearing the Rhino, Equinox, and EQ-300 trademarks. Following is an illustration.



**Diagram I**

None of the units Sun Water manufactured for Equinox Products bore any marks informing the consumer that they were manufactured by Sun Water nor that they were a product of Equinox Products.

In April 2002, Defendants received an email from the counsel for the EIC receiver demanding that Defendants "cease and desist from operating a business enterprise using the name 'Equinox.'" In response, Equinox Products voluntarily changed its name to Vitasalus, Incorporated, but its website to this day remains the same. The EIC receiver has never asserted any objection to Defendants' use of equinox-products as the internet domain name for their web-based business. And despite this name change, Defendants continued to market and sell their newly manufactured whole-house systems under the names Equinox, EQ-300, and Rhino. The sales of this product are largely achieved through their website.

13

Starting in December 2002, however, Sun Water began marketing the "EQ-300 Rhino Whole House Filter System" for direct purchase from its website.[3]  Although the Aquasana website indicates that the unit it sells is the "EQ-300 Rhino" system, the picture of the unit on the Aquasana website showed the unit with the two Equinox labels affixed to the top blue tank (diagram G) and the small, square EQ-300 label (Diagram D) on the bottom tank.  And still, other than the system's being offered through the Aquasana website, nothing in the description of the unit or its picture on the website would lead a potential consumer to believe that the "EQ-300 Rhino" was a product of Sun Water.  Moreover, Plaintiffs admit, "Some of the old labels purchased from the receiver of EIC were used on the new whole-house . . . systems."

In October 2003, the relationship between Plaintiffs and Defendants began to change.  Plaintiffs began to demand that Defendants sign an "Authorized Direct Dealer Agreement."  According to Defendants, they had resisted signing any direct-dealer agreement because they were not interested in being a distributor for Sun Water or Aquasana.  Rather, Defendants wanted Sun Water to remain as the manufacturer of their new whole-house systems they had been selling for the past two years.  However, Sun Water's president, Strand, sent a letter to Defendants informing them that starting October 15, 2003,

> all dealers who choose to deal directly with
> [Sun Water] must complete and return a signed copy
> of the 'Authorized Direct Dealer Agreement.  Any

---

[3]  http://www.aquasana.com

> Dealer who chooses not to comply with the terms of the "Agreement," will either be referred to a socking Distributor for future purchases or be unable to make future direct purchases of [Sun Water's] Products . . . .

Faced with the threatened loss of its manufacturer, Defendants reluctantly signed the direct-dealer agreement.

Defendants, now as Vitasalus, made their final purchase of Sun Water manufactured systems around February 2004.  Defendants secured a new manufacturer for the system in August 2004.  And the direct-dealer agreement expired by its own terms in October 2004.

Defendants soon sold the remaining units from Sun Water and then began ordering from their new manufacturer.  That manufacturer assembles the units using industry standard tanks, parts, and mediae, and ships the units to Defendants unlabeled.  The units are substantially similar in design and color to the units Sun Water previously manufactured and the units EIC sold for many years.

Defendants decided to distinguish their new product from the one Sun Water had manufactured.  At first, Defendants attempted to accomplish this by using a new label affixed to the top blue tank.  The new label identified the filtration system as the "Blue Rhino EQ-300 Whole House Water Filtration System."  In the center of the label was Vitasalus's official logo.  Following is an illustration.



**Diagram J**

Currently, Defendants market their product as the "Premium EQ-300 Rhino Whole House Water Filtration System."  The label is the same except it identifies the system as the "Premium EQ-300" instead of the "Blue Rhino EQ-300," as illustrated in Diagram K, below.



**Diagram K**

Although Defendants' system is similar to the one Sun Water manufactured and EIC sold years prior, as illustrated below, there are noticeable differences.  The tanks are larger and painted a lighter shade of blue than Sun Water's and EIC's older units.  Plus, Defen-

16

dants' website takes great care in informing the customer of the differences between its "Premium EQ-300 Rhino" model and the "older EQ-300s" as illustrated below.



**Diagram L**

Presently, Sun Water markets its whole-house system as: "The Original EQUINOX Rhino EQ-300 Whole House Water Filter System."  It affixes two new labels to the top blue tank.  The upper label is a new "Rhino" label that is a darker shade of blue than that previously

used.  It features a white outlined image of a rhinoceros.  On the top
of the label is the word "Rhino" in bright-red lettering.  And in
white lettering is the phrase, "High Efficiency/high capacity Water
Treatment System By Sun Water Systems Incorporated."  The side of the
label reads, in fine print: "A Product of: Sun Water Systems, Inc.,"
and gives the address and phone number of Sun Water.  On the bottom
right side of the label is a small sticker with "Model EQ-300" on it.
The lower label contains the Sun Water-Aquasana logo.  It is white
with a blue swirl design.  Under the swirl design is "Aquasana" in
blue lettering, all as can be seen in Diagrams M and N, below.



**Diagram M**



**Diagram N**

Sun Water registered the word mark "Equinox" as its trademark for water filters in January 2005.  In its application, Sun Water claimed it first used the mark in commerce in April 2002.  Vitasalus filed an application to register the word mark Equinox in March 2005, and claimed that it first used the mark in commerce in January 1997.  Sun Water filed an opposition to Vitasalus's registration, so that application is currently stayed pending the resolution of this case. Both parties filed applications for trademark registrations for the word mark EQ-300.  Vitasalus filed its application in March 2005, and stated that it first used the mark in commerce in January 1997.  Sun Water filed its application in February 2006, but the application does not state when Sun Water claims it first used the word mark in commerce.  Both applications are currently stayed pending the resolution of this case.

As mentioned above, Sun Water was assigned any rights and ownership EIC had in the registered trademark, "Rhino."  But also as mentioned above, that trademark registration expired in August 2004. Inexplicably, however, Sun Water filed an application with the USPTO to register the word mark Rhino in July 2004, claiming it first used the mark in commerce in August 1992.  Like the other applications above, it is stayed pending the resolution of this case.

Finally, Sun Water received trademark registrations from the Texas Office of the Secretary of State for the word marks Rhino, EQ-300, and Equinox in April 2006.  There is no evidence that the product

design of the whole-house system is registered as a trade dress under federal or state law.

II.  Analysis

To obtain a preliminary injunction, Plaintiffs must clearly establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to Plaintiffs outweighs any harm to Defendants that may result from the injunction; and, (4) that the injunction will not undermine the public interest.  *See Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 (5th Cir. 1989).  A preliminary injunction is an extraordinary remedy, and it is well-settled law that it will only be granted if Plaintiffs clearly carry their burden of persuasion on all four factors.  *Allied Mktg. Group, Inc.,* 878 F.2d at 809.  If the Court concludes that Plaintiffs have failed to carry their burden on any one of the four factors, then the Court must deny the motion for a preliminary injunction and the Court need not address any of the remaining factors.  "The decision whether to grant a preliminary injunction is within the discretion of the district court." *Id.*

Plaintiffs' allege that Defendants are infringing on their trademarks and trade dress and seek to have the Court preliminarily enjoin Defendants from further infringement.  To understand trademark law is to understand two very important concepts: First, trademark law

20

seeks to promote free-market competition. *Union National Bank of Laredo, Texas v. Union National Bank of Austin, Texas,* 909 F.2d 839, 843-44 (5th Cir. 1990). It is not intended to create monopolies. *Id.* It accomplishes this by protecting consumers against confusion as to the origin of a product. It ensures that consumers will be fully capable of identifying the true source of a product thereby giving them the ability to shop different brands.

Second, trademark law seeks to protect the good will of producers in their trade names, which free-riders may attempt to appropriate by using the producer's mark or one that is deceptively similar. *Id.* It seeks to protect a business's hard-won goodwill from others who may seek to unfairly appropriate that goodwill by marketing a cheaper, but inferior, product—the result of which is to temporarily reap the benefits of trading on that goodwill until it has been tarnished and is no longer marketable.

A trademark is not a right that exists in gross. Rather, it is the right to the goodwill flowing from the identification of a specific product with a particular business. *Aircraft Novelties Corporation v. Baxter Lane Company of Amarillo,* 685 F.2d 988, 990 (5th Cir. 1982). The primary significance of a trademark in the minds of the consuming public is not the product but the producer. *Society of Financial Examiners v. National Association of Certified Fraud Examiners, Inc.,* 41 F.3d 223, 227 (5th Cir. 1995). A trademark tells a consumer that any product bearing that mark originated from a particular business and carries with it all of the goodwill and

21

reputation associated with that business.  The same is true of trade dress.


A.   Plaintiffs' Likelihood of Success on the Merits as to Trade Dress and Trademark Infringement

1.   Trade Dress

> It is well established that trade dress can be protected under federal law.  The design or packaging of a product may acquire a distinctive-ness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.  In these respects protec-tion for trade dress exists to promote competi-tion.

*Traffix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, 28 (2001).  Trade dress may include features like size, shape, color or color combinations, textures, graphics, and even certain sales techniques that characterize a particular product as coming from a certain source.  *Sunbeam Products, Inc. v. The West Bend Company,* 123 F.3d 246, 251 n.3 (1997).

Generally, it has been recognized that there are two categories of trade dress.  One is the product's packaging.  Because the packaging of a product is used most often to identify the product's source, product-packaging trade dress can be inherently distinc-tive—that is, no proof of secondary meaning need be shown.  *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 212, 215 (2000).  However, product-design trade dress "is not inherently distinctive,"

and cannot be protected without a showing of secondary meaning. *Id.* And the Supreme Court has cautioned against the misuse or over-extension of product-design trade-dress protection. *Id.* at 29; *Wal-Mart Stores, Inc.,* 529 U.S. at 213.

> In the case of product design, . . . consumer predisposition to equate the feature with the source does not exist. Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.

*Wal-Mart Stores,* 529 U.S. at 213. Thus, the inquiry is whether the product design creates a distinct visual impression upon the consumer that identifies the product's source, thereby distinguishing it from products manufactured by others. *Sunbeam,* 123 F.3d at 251.

To establish product-design trade-dress infringement, Plaintiffs must first demonstrate that it qualifies for protection by establishing that the product design has acquired secondary meaning and that the particular design features are nonfunctional. *Id; see also Wal-Mart Stores,* 529 U.S. at 214; *Traffix,* 523 U.S. at 29.

To demonstrate secondary meaning, Plaintiffs "must show that, in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc., et al. v. Ives laboratories, Inc.,* 456 U.S. 844, 851 n.11 (1982); *see also Kellog Company v. National Biscuit Company,* 305 U.S. 111, 118-19 (1938). The gravamen of secondary meaning is the consumer's association of the product's

design to a single source of that product. *Sunbeam Products, Inc.,* 123 F.3d at 253. Thus, if the consumer has become accustomed to identifying a particular product through its design and not the source of that product, the product design is not protectable trade dress. *See e.g. Kellog Company*, 305 U.S. at 121(holding that the public had become accustomed to identifying the cereal "shredded wheat" by the particular pillow-shaped design but did not associate that design with the product's source).

The determination of whether a product's design has acquired secondary meaning "is primarily an empirical inquiry," and "survey evidence is the most direct and persuasive evidence of secondary meaning." *Sunbeam Products, Inc.,* 123 F.3d at 253-54. But consumer surveys are not the only relevant evidence to establish secondary meaning. "In addition, the court may consider the length and manner of the use of a mark, the nature and extent of advertising and promotion of the mark, the sales volume of the product, and instances of actual confusion." *Id.* at 254. Nevertheless, the ultimate determination of secondary meaning remains an empirical question of consumer association of the product design to its manufacturing source. *Id.*

With this in mind, the Court concludes that Plaintiffs have failed to meet their burden of demonstrating a substantial likelihood of establishing at trial that the design of the whole-house system has acquired secondary meaning—that is, that the design has become

synonymous with Sun Water or Aquasana in the minds of the consuming public.

First, Plaintiffs have not submitted any survey evidence to prove that the stacked-tank design and color scheme of the whole-house system has come to be uniquely associated as a product of Sun Water or Aquasana.   And the evidence Plaintiffs have submitted fails to demonstrate that the public has come to identify that product design and color scheme as a product manufactured by Sun Water.

Throughout their motion, Plaintiffs claim that the design of the whole-house system is the "Sun Water trade dress."   Strand claims in his affidavit that,

> The selection of colors of the pieces of the system by [Sun Water] was arbitrary, and taken as a whole, serves no function either to describe the product or to assist in its effective packaging. This color scheme serves only to identify the system as coming from [Sun Water].

But as Strand concedes, he created that product design when he owned IPC and partnered with EIC.   Thus, it is impossible that Strand's design of the whole-house system was intended to serve as identifying the product as coming from a company that would not exist for at least another six years.   If the design of the product was intended to acquire any secondary meaning, it was to identify the whole-house system as a product of EIC—not Sun Water or Aquasana.

The stacked-tank design and color scheme Strand claims he created were for a product that IPC manufactured and EIC sold from 1991 until 2000.   The evidence establishes that, by 1995, IPC became a hidden manufacturing resource of the whole-house system for EIC.   And by

25

1995, the whole-house system bore no marks indicating that it was a product of IPC; rather, all of its marks identified it as a product of EIC.  In 1998, Strand sold all of his ownership and interest in IPC to EIC.

Strand did not form Sun Water until 1998.  When formed, Sun Water was, and remains to this day, a separate and distinct business from IPC and EIC.  And between 2000 and 2002, Sun Water was a hidden manufacturing resource for Vitasalus (formerly Equinox-Products), producing the whole-house system using the same product design. During that time, the whole-house system bore no marks identifying it as a product manufactured by Sun Water.  The whole-house system was available for purchase through Equinox Products' website, which advertised itself as a place where one could purchase products that originated from EIC.  It wasn't until late 2002 that Sun Water began to sell the whole-house system to the public.  Thus, any secondary meaning that developed in the product design of the whole-house system, if any, would be associated with EIC and not Sun Water or Aquasana.  Accordingly, Plaintiffs cannot claim any proprietary rights in the product-design trade dress that, at best, identifies the whole-house system as a product of another company and not theirs.

Nevertheless, even assuming that the product design has acquired secondary meaning identifying it with Sun Water, the trade dress is not protectable because the whole-house system's design and color scheme serve particular functions.  In a civil action for infringement of unregistered trade dress, "the person who asserts trade dress

26

protection has the burden of proving that the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3).

As Defendants point out, the color blue has often been associated with water and various water products. Defendants have provided evidence of numerous water filtration systems, some of which are whole-house systems, that are blue colored. Thus, the blue coloring of the tanks more likely serves an aesthetic function designed to make the whole-house system more appealing to a potential customer. To allow Plaintiffs the exclusive use of the color blue in association with the marketing and sale of water filters would put competitors at a "significant non-reputation-related disadvantage." *Traffix,* 532 U.S. at 32. Blue is the only color that is almost exclusively associated with water, and routinely blue is more specifically connected with water that is clear, pure, healthy, and beautiful. *See* Charles L. Braun and Sergi N. Smirnov, *Why is Water Blue?,* J. CHEM. EDU. 70(8), 612 (1993).[4] Thus, where a manufacturer employs a color scheme to serve the non-trademark function of satisfying "the noble instinct for giving the right touch of beauty to common and necessary things, . . . it is open to their competitors to do the same." *Qualitex Company v. Jacobson Products Company,* 514 U.S. 159, 170 (1995)(internal quotations and citations omitted).

Likewise, the black base in which the system's bottom tank sits also has a particular function. It serves to protect the bottom tank

---

[4] This article is also reproduced at http://www.darthmouth.edu/~etrnsfer/water.htm.

as it sits on the floor.  And the shut-off valve serves as a safety mechanism, and its orange color is commonly used in the plumbing industry to identify that valve as the shut-off valve.

Finally, Plaintiffs' own evidence establishes that the stacked-tank design serves a particular function designed to make the water filtering system more efficient.  As explained by Plaintiffs, one filtering media is more efficient when the water filters through it in an upward direction.  The other filtering mediae is more efficient when the water filters through it in a downward direction.  And Strand concedes that the product's design "adds additional cost to the system . . . ."  The Supreme Court has explained that "a product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article . . . ."  *Qualitex Company,* 514 U.S. at 165.  Here, the stacked-tank design is essential to the use of the water filter, affects its cost, and affects the quality of the filtered water.

> Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying.  As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy.  Allowing competitors to copy will have salutary effects in many instances.

*Traffix Devices, Inc.,* 532 U.S. at 29.

Even assuming that the design of the whole-house system is protected, Plaintiffs still must demonstrate infringement.  *Sunbeam Products, Inc.,* 123 F.3d at 251.  Infringement occurs when there is a

28

likelihood of confusion between Plaintiffs' product and Defendants' product. *Id.* In determining the likelihood of confusion, the district court must apply what is called the "digits of confusion" test. *Id.* at 257. These "digits" include: (1) similarity of the two products; (2) identity of retail outlets and purchasers; (3) identity of advertising media; (4) strength of the trade dress; (5) intent of defendants; (6) similarity of design; (7) actual confusion; and, (8) degree of care employed by consumers. *Id.* "Proof of actual confusion is not a prerequisite, and no single factor is dispositive of the likelihood of confusion." *Id.* Furthermore, these factors are not all inclusive and other factors present in a particular case may inform the Court's decision.

Weighing the factors listed above, the Court concludes that Plaintiffs have failed to demonstrate a substantial likelihood of establishing at trial the probability of confusion. Plaintiffs do present a couple of instances where actual confusion has occurred. But Defendants have also presented instances where customers have requested additional information about the differences between their product and Plaintiffs' product. While actual confusion is a factor, the couple of instances presented by Plaintiffs are easily offset by Defendants' instances that show potential consumers using a strong degree of care before purchasing a whole-house system.

The whole-house system is relatively expensive, ranging from five-hundred to more than a thousand dollars. The more expensive a product, the more likely a consumer will spend more time researching

29

the product and carefully comparing the product to its competitors. This reduces the likelihood of confusion.

And while both products are similar, the evidence shows that Defendants take great care in informing potential consumers that their newer "Premium EQ-300 Rhino" system is different from the "older" model sold by Plaintiffs or others. Defendants' website places side by side pictures of the system Plaintiffs sell and the system that EIC sold next to their system. There is also a chart that describes the specific differences between the systems. After their fallout with Plaintiffs, Defendants sought to sever all ties and association with Plaintiffs. In furtherance of that goal, Defendants sought out a new manufacturing source to produce a newer and different whole-house system from the one they had Plaintiffs manufacture for them. It also seems clear that Defendants understood that they would be competing with Plaintiffs in the sale of the whole-house system. Defendants' newer "premium" model is their attempt to distinguish their product from the one that originates from Plaintiffs. This is clear evidence that Defendants have no intention of having their product confused with Plaintiffs'.

As discussed above, even assuming Plaintiffs have a protectable trade dress in the design of the whole-house system, it is not a particularly strong trade dress. Many other competitors besides Defendants use blue coloring with the marketing of their water filters and other competitors also utilize the stacked-tank design. Blue is a fairly universal mark for water products and the orange handle is

commonly used in the plumbing industry to identify a shut-off valve. Thus, even if Plaintiffs can claim any protection in the product-design trade dress of their whole-house system, they fail to demonstrate a substantial likelihood of establishing infringement by Defendants.

2.    Trademarks "Equinox," "EQ-300," and "Rhino"

The Lanham Act protects both registered and unregistered trademarks.   *See* 15 U.S.C. §§ 1114 (registered marks) and 1125(a) (unregistered marks).

> A party seeking an injunction for trademark infringement must clear several hurdles in order to prevail.  First, he must prove that the name he seeks to protect is eligible for protection.  He must then prove he is the senior user.  Having proven these elements, he must then show a likelihood of confusion between his mark and that of the defendant.  Finally, because he is asking for the equitable remedy of an injunction, he must show that the likelihood of confusion will actually cause him irreparable injury for which there is no adequate legal remedy.

*Union National Bank of Laredo, Texas v. Union National Bank of Austin, Texas,* 909 F.2d 839, 844 (5th Cir. 1990); *see also Zapata Corporation v. Zapata Trading International, Inc.,* 841 S.W.2d 45, 47 (Tex.App.—Houston 1992.)("A common law trademark infringement action under Texas law presents no difference in issues than those under federal trademark infringement actions.").[5]  Thus, to demonstrate trademark infringement, Plaintiffs must prove that they are the owners

---

[5] Plaintiffs have brought trademark infringement claims against Defendants based on both federal and Texas law.

of a valid and protectable mark and that Defendants' use of their trademark or a deceptively similar mark creates a likelihood of confusion.

The first issue in any trademark infringement case is whether the word or phrase is initially registerable or protectable. *Id.* To make this determination, the Court must first decide into which of the following categories the word or phrase belongs: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or, (5) fanciful. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768 (1992). These are not clearly defined categories; rather, they are like tones in a spectrum that tend to blur at the edges and merge together. *See Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 790-92 (5th Cir. 1983), *overruled on other grounds in KP Permanent Make-up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 116 (2004). Thus, a mark may fall into the blurred area between two categories. Moreover, "the categorization of a term is properly considered a matter of fact because the appropriate categorization is not self-evident." *Union National Bank,* 909 F.2d at 846.

Generic terms are considered the weakest marks and "are never eligible for trademark protection." *Union National Bank,* 909 F.2d at 844. Generic terms identify a genus or class of things of which the particular item is merely a member. *Id.* at 845. "Fish," for example, "is a generic term which applies with equal force to sole, haddock, perch, salmon, bass, and carp." *Id.*

32

Descriptive terms, while protectable, are weaker marks and may only be protected after proof that the mark has developed secondary meaning. *Id.* at 844; *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 211 (2000). As mentioned above, secondary meaning occurs "when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc.,* 529 U.S. at 211 (internal quotations omitted). Descriptive terms require secondary meaning because, by their nature, they normally serve to identify a characteristic or quality of a product or service. *Union National Bank,* 909 F.2d at 845. Descriptive terms, for example, are usually adjectives such as "green," "speedy," "reliable," "mighty," or "pretty." *Id.* But descriptive terms can be geographical such as "Texas," "Midwest," "Fort Worth," or "Rodeo Drive." *Id.*

Suggestive, arbitrary, and fanciful terms are considered the strongest marks and are all protectable without proof of secondary meaning because they are considered to be "inherently distinctive." *Wal-Mart Stores, Inc.,* 529 U.S. at 211; *Union National Bank,* 909 F.2d at 844. An inherently distinctive mark is a mark that by its "intrinsic nature serves to identify a particular source of a product . . . ." *Two Pesos, Inc.,* 505 U.S. at 768.

Suggestive terms are marks that suggest rather than describe some particular product characteristic. *Union National Bank,* 909 F.2d at 845. Suggestive marks require "the consumer to exercise the imagination in order to draw a conclusion as to the nature of goods and

33

services." *Zatarains,* 698 F.2d at 791.   Oft-cited examples of suggestive marks are "Tide" for laundry detergent and "Penguin" for refrigerators. *Wal-Mart Stores, Inc.,* 529 U.S. at 211; *Union National Bank,* 909 F.2d at 845.

Arbitrary and fanciful terms are marks that "bear no relationship to the products or services to which they are applied." *Zatarains,* 698 F.2d at 791.   Arbitrary terms are ordinary words that do not suggest or describe the product or services involved.   Arbitrary marks, for example, are "Fish" as applied to a bank or "Camel" as applied to cigarettes. *Wal-Mart Stores, Inc.,* 529 U.S. at 211; *Union National Bank,* 909 F.2d at 845.   Fanciful terms, by contrast, are coined or made-up words such as "Xerox," or "Kodak."   *Id.*

Applying these categories here, the Court concludes that Plaintiffs have demonstrated a substantial likelihood of establishing that the marks "Rhino," "Equinox," and "EQ-300" are protectable.   The Rhino mark is used in conjunction with a depiction of a rhinoceros and is applied to the whole-house system.   A rhinoceros is typically viewed as a strong or powerful animal that many attribute an aggres-sive personality.   When a consumer sees the Rhino mark in conjunction with the depiction of a rhinoceros, especially with the most recent depiction used by Sun Water, the mark tends to suggest to the consumer that the whole-house system is a strong or powerful filtering system that will aggressively filter out perceived undesirable impurities in the water.   But it is also arbitrary in the sense that many other animals having the same attributes as a rhinoceros could have been

34

chosen—a bull for example.  The Rhino mark, thus, seems to fall into that blurred area between suggestive and arbitrary.  Either way, the Court concludes that Rhino is protectable as a fairly strong trademark.

The Equinox mark, when used in conjunction with the whole-house system, is an arbitrary mark.  Ordinarily, "equinox" refers to the two times per year when the sun crosses the equator, causing the day and night to be of equal length.  *See* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 421 (1991).  When used in conjunction with the whole-house system, the mark Equinox bears no relationship to the product.  Its only purpose was to identify the whole-house system as a product of EIC.  Thus, the Court concludes that the Equinox mark is protectable as a strong trademark.

Finally, the EQ-300 mark is clearly a fanciful mark.  It is a made-up combination of letters and numerals.  While it has been used to designate the model number of the whole-house system, the "EQ" part of the fanciful mark directs the consumer back to the Equinox mark. The evidence shows that through the 1990s, EIC repeatedly used "EQ" in combination with numerals as model numbers for its various water-filtration systems with the same effect—to identify that product model as a product of EIC.  Therefore, the EQ-300 fanciful mark really serves to further identify the whole-house system with its source. The Court concludes that the EQ-300 mark is also protectable as a strong trademark.

Having determined that the marks Rhino, Equinox, and EQ-300 are protectable, Plaintiffs must now establish that they are the owners of the marks.  Plaintiffs registered all three marks with the Texas secretary of state.  Under Texas law, a certificate of registration is prima-facie proof of the validity of the mark, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce.  *Texas A & M University System v. University Book Store, Inc.,* 683 S.W.2d 140, 144 (Tex.App.—Waco 1984, writ denied).  Similarly, section 1115(a) of the Lanham Act provides for a presumption of validity and ownership in a registered mark.  But under both Texas and federal law, these are rebuttable presumptions.  *Texas A & M University System,* 683 S.W.2d at 144; 15 U.S.C. §§ 1065 and 1115(a); *Zatarains,* 698 F.2d at 793, n.4.  This is especially true if the mark was fraudulently registered or has since been abandoned, and an opposing party is not precluded from proving any legal or equitable defense or defect that could otherwise be asserted if the mark had not been registered.  *Id.;* Tex. Occ. Code 16.16 (a)(4).

Turning first to the Rhino mark, the Court concludes that EIC and IPC long ago abandoned that mark.  Under the Lanham Act, a mark is abandoned

> when its use has been discontinued with intent not
> to resume such use.  Intent not to resume may be
> inferred from the circumstances.  Nonuse for three
> consecutive years shall be prima facie evidence of
> abandonment.  "Use" of a mark means the bona fide
> use of that mark made in the ordinary course of
> trade, and not made merely to reserve a right in
> a mark.

15 U.S.C. § 1127; *see also* Tex. Occ. Code 16.16(a)(4) (directing Texas secretary of state to cancel a registration on a finding that the registered mark has been abandoned).   To establish abandonment, it must be shown that the owner of the mark discontinued use of the mark and intended not to resume its use. *Vais Arms, Inc. v. George Vais,* 383 F.3d 287, 293 (5th Cir. 2004).   Intent is determined by an objective test. *Id.*

The evidence overwhelmingly establishes that EIC and IPC had abandoned the Rhino mark as early as 1995 when the whole-house system EIC sold no longer bore any label bearing the Rhino mark or the depiction of the rhinoceros.   Beginning in 1995, the whole-house system became known as the "Equinox EQ-300 Whole House Water Treatment System."   The intent was obvious: to tell the consumer that the whole-house system was a product that came from EIC.   From 1995 until 2000, when EIC and IPC were placed into permanent receivership, the Rhino mark was never used again.   After more than three consecutive years of nonuse, there is a presumption that EIC and IPC abandoned the Rhino mark.

Furthermore, the declaration of EIC's chief financial officer is insufficient to evidence an intent not to abandon the Rhino mark. First, that declaration was made in 1999, four years after EIC and IPC had since discontinued using the Rhino mark.   Second, but more importantly, the declaration simply contains a vague expression of subjective intent to resume using the mark at some unspecified date in the future.   The declaration also conditions EIC's intent to resume

37

use of the Rhino mark.   According to the declaration, EIC never planned on resuming its use of the Rhino mark unless "capacity for production can be increased, or if demand for the product under registrants' [sic] **primary mark** lessens . . . ." (Emphasis added.) Such vague subjective and conditional statements cannot defeat a claim of abandonment. *Id.* at 294.  In fact, the declaration admits that the Rhino mark is not EIC's "primary mark."   Thus, that declaration implies that EIC's intent in not relinquishing the Rhino mark was to hoard the mark and prevent its use by others. *See Exxon Corporation v. Humble Exploration Company,* 695 F.2d 96, 102 (5th Cir. 1983); *Vais,* 383 F.3d at 293, n.14.  "If all a party had to do to avoid a holding of abandonment was to testify that he never had any intent to abandon the mark, or never had any intent not to resume use, then no mark would ever be held abandoned." *Id.* at 294, n.15 (internal quotations and citations omitted).   Thus, the Court concludes that EIC and IPC abandoned the Rhino mark.

As noted, Plaintiffs purchased from EIC and IPC, among other things, "all allowable trademarks."  And EIC had transferred to Sun Water any and all rights it had in the registered Rhino mark.  Having long since abandoned the Rhino mark, EIC and IPC had no rights in that mark to sell or transfer to Plaintiffs.  Furthermore, the evidence clearly establishes that Defendants began using the Rhino mark long before Plaintiffs.   Because the Rhino mark had been abandoned, Defendants were free to take it for themselves.

Like the trade dress discussed above, Plaintiffs attempt to "back date" their claim of first use of the Rhino mark to 1988 when Strand first used that mark in connection with IPC's manufacture of the whole-house system.  Throughout their affidavits, Plaintiffs attempt to equate IPC's and EIC's uses of the Rhino mark to Sun Water's.  But like the trade dress discussed above, the Court cannot find that Strand intended the Rhino mark to identify the whole-house system with a company that would not exist for at least another six years.  When the Rhino mark was used in commerce, it was used by and to cultivate the goodwill of IPC and EIC, not Sun Water or Aquasana.  Therefore, Plaintiffs cannot claim IPC's and EIC's use of the mark as their own. IPC and EIC no longer had any goodwill in the Rhino mark to assign to Plaintiffs since they abandoned its use long before the mark's assignment.  Accordingly, the Court concludes that Plaintiffs have failed to demonstrate a substantial likelihood of establishing ownership in the Rhino mark.

Turning next to the Equinox and EQ-300 marks, the Court concludes that Plaintiffs have failed to demonstrate a substantial likelihood of establishing ownership in those marks as well.  Although Plaintiffs have successfully registered the Equinox and EQ-300 marks under the Texas code and have successfully registered the Equinox mark under the Lanham Act, as noted above, those registrations are not conclusive evidence of Plaintiffs' ownership in those marks.  And Plaintiffs' claim to ownership in those marks is subject to any legal or equitable

defense or defect that might have been asserted by a non-registrant just as if such mark had not been registered.

The evidence shows that at the time Plaintiffs registered the Equinox and EQ-300 marks, they were not the senior users. *See Union National Bank,* 909 F.2d at 844 (stating a plaintiff claiming trademark infringement must prove the mark "is eligible for protection" and that the plaintiff "is the senior user"). Plaintiffs own application for the registration of the Equinox mark concedes that they did not begin to use that mark until April 2002. The evidence clearly establishes that Defendants had been using that mark for at least two years beginning in 2000. Also, the evidence establishes that Defendants began using the EQ-300 mark nearly two years prior to Plaintiffs.

Furthermore, the evidence shows that Plaintiffs were fully aware of Defendants' use of the Equinox and EQ-300 trademarks prior to Plaintiffs' use. In fact, during that time, Plaintiffs were the hidden manufacturing resource for Defendants' whole-house system. And during that time, it was Plaintiffs who placed labels that identified the system as the Rhino whole-house system by IPC or EIC—with no marks identifying Sun Water or Aquasana. Thus, the implication is that for the two years Sun Water manufactured whole-house systems for Vitasalus, Sun Water had no intention of appropriating or cultivating the goodwill in the trademarks Equinox or EQ-300 because there was no way for the consuming public to associate those trademarks with Sun Water or its trade name, Aquasana.

40

But just like the trade dress and the Rhino mark above, here too, Plaintiffs attempt to capitalize on EIC's use of these marks between 1995 and 2000 because Strand was associated with EIC during most of that time. But just like the trade dress and Rhino mark issues discussed above, it is obvious that the Equinox and EQ-300 marks were intended to serve as identifying the whole-house system as coming from EIC and not a company that would not exist for at least another six years. Therefore, Plaintiffs cannot claim IPC's and EIC's use of the Equinox and EQ-300 marks as their own.

Additionally, Plaintiffs have failed to present any empirical evidence that the Equinox and EQ-300 marks have become or are synonymous with Sun Water or Aquasana. Instead, the evidence in this case can, at best, be interpreted in two ways—either the marks are synonymous with EIC or the marks are synonymous with the whole-house system itself and not its origin. Either way, because a trademark has no significance apart from the goodwill it symbolizes, Plaintiffs fail to establish ownership in the Equinox and EQ-300 marks.

First, if the Equinox and EQ-300 marks prompt any association as to the origin of the whole-house system, it is clearly with EIC and not Sun Water or Aquasana—or Vitasalus, for that matter. These marks had been used in connection with identifying the whole-house system as a product of EIC from at least 1994 until 2000. Even still, Defendants, as former EIC distributors, continued to use the marks after EIC was placed into receivership in connection with a business they formed that explicitly and unambiguously informed the consumer that it

41

sold products originating from and previously sold by EIC. Still more, the EIC receiver placed a notice on the receiver's official internet webpage that advised the public to visit Defendants' internet website "if you are interested in purchasing or selling products or accessories previously sold by Equinox International . . . ." Even the EIC receiver became concerned that Defendants' internet business conveyed the misconception to the consuming public that EIC remained in operation and continued to produce merchandise. All of this shows that the Equinox and EQ-300 marks were synonymous with EIC—not Sun Water or Aquasana. The record is simply devoid of any evidence that the marks Equinox and EQ-300 ever had been, or has since become, associated in the minds of the consuming public with Sun Water, Aquasana, or Vitasalus. What is fairly clear in the record is that both Plaintiffs and Defendants have used the Equinox and EQ-300 marks to capitalize on the goodwill associated with those marks that had accrued since EIC employed them in 1994.

Second, even if the Equinox and EQ-300 marks are no longer synonymous with EIC, the evidence tends to show that these marks have evolved to become synonymous with the product itself rather than the source of the product. "Where an article may be manufactured by all, a particular manufacturer can no more assert exclusive rights in a form in which the public has become accustomed to see the article and which, in the minds of the public, is primarily associated with the article rather than a particular producer, than it can in the case of a name with similar connections in the public mind." *Kellogg Company,*

305 U.S. at 120 (concluding that the public had become accustomed to associating the name "shredded wheat" with the cereal and not the producer of the cereal).  Here, even if the Equinox and EQ-300 marks are not, or are no longer, associated with EIC, the evidence tends to show that the consuming public has come to associate those marks with the whole-house system, rather than any source of that product.  This is evident from the fact that various outlets after the dissolution of EIC continued to sell the whole-house system using the Equinox and EQ-300 marks as identifiers of the system rather than identifiers of the system's source.  The examples provided by Defendants of customer inquiries into the differences between their premium model EQ-300 Rhino system and older Equinox EQ-300 systems illustrate customer identification of the marks Equinox and EQ-300 with the system rather than the system's source.  In those examples, customers identified the whole-house system by the marks Rhino, Equinox, and EQ-300, and there is no indication that the customers connected those marks to any particular manufacturer.  Instead, that connection came from Defendants' website.  And Plaintiffs' new label and website use the marks Rhino, Equinox, and EQ-300 to identify system and not the system's origin.  Plaintiffs' marks Sun Water and Aquasana are what identify their system as coming from themselves.  Thus, the clear implication is that the marks Equinox, Rhino, and EQ-300 now identify the particular stacked-tank whole-house system and not the system's manufacturer.

43

In their motion, Plaintiffs emphasize that Defendants are precluded from asserting any ownership rights in the marks Rhino, Equinox, and EQ-300 because Defendants were, and had signed agreements to be, distributors of EIC products and then later Plaintiffs' products. But since the Court has already determined that Plaintiffs have failed to demonstrate a substantial likelihood of establishing that they are the owners of the above-mentioned marks, the Court need not decide at this time what, if any, effect Defendants' distributor-ship agreements with EIC and Plaintiffs may have on their ability to claim ownership in any of these marks. Plaintiffs cannot claim ownership in the Rhino mark because it had been abandoned. And they cannot claim ownership in the Equinox and EQ-300 marks because those marks either symbolize the goodwill of EIC, or they have come to identify the whole-house system itself and not its producer.

Finally, even assuming Plaintiffs' ownership in the Rhino, Equinox, and EQ-300 marks, under the digits-of-confusion test mentioned above, they fail to demonstrate a substantial likelihood of establishing infringement. As discussed in more detail above, and not repeated here, Defendants take great care to distinguish their whole-house system from that of Plaintiffs. Specifically regarding the use of the Rhino, Equinox, and EQ-300 marks, Defendants also use the word "premium" to further differentiate their whole-house system from that of the "older" models.

B.   Plaintiffs' Likelihood of Success on Their Claims of Common Law
     Unfair Competition and Trademark Dilution

1.   Common Law Unfair Competition

"Unfair competition is a form of unlawful business injury which consists essentially, in the passing off or attempting to pass off on the public, the goods or business of one person as and for the business of another." *Taylor Made Golf Company, Inc. v. MJT Consulting Group, LLC,* 265 F.Supp.2d 732, 745 (N.D.Tex. 2003)(internal quotations and citations omitted). "As a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition." *Marathon Manufacturing Company v. Enerlite Products Corporation,* 767 F.2d 214, 217 (5th Cir. 1985). The gravamen of any unfair-competition claim is the likelihood of the consuming public's confusing the products of one business with those originating from another. *Id.*

Plaintiffs argue that,

> Defendants have demonstrated their intent to pass
> off their goods as those of [Sun Water]. These
> efforts have been shown by Defendants' use of the
> [Sun Water] trademarks and trade dress on products
> that are almost identical to those sold by [Sun
> Water]. Based on these actions alone, [Plaintiffs
> have] demonstrated the likelihood of confusion.

But as discussed above, Defendants' website carefully and explicitly distinguishes their whole-house system from that of Plaintiffs. The evidence shows that Defendants intentionally altered their product so that there would be no mistaken association of them with Plaintiffs. It is clear that Defendants have no intention on passing off their product as that of Plaintiffs. Thus, the Court's analysis need go no

45

further.  Plaintiffs have failed to meet their burden of establishing a substantial likelihood of success on the merits.


2.   Trademark Dilution

At its core, "trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product."  *The Scott Fetzer Company v. House of Vacuums, Inc.*, 381 F.3d 477, 489 (5th Cir. 2004).   Under federal law, to establish trademark dilution, Plaintiffs must first prove that they are the owners "of a famous mark that is distinctive."   15 U.S.C. § 1125(c)(1).   Under Texas law, Plaintiffs must first prove that they are the owners of a distinctive mark.   Tex. Bus. & Com. Code § 16.29; *see also The Scott Fetzer Company,* 381 F.3d At 489 (discussing the differences between the federal law and state law).

Again, the Court has concluded that Plaintiffs have failed to demonstrate a substantial likelihood of establishing their ownership in the disputed trademarks.   Therefore, the Court's analysis may conclude.


III. Conclusion

After careful review of Plaintiffs' motion for a preliminary injunction, the responses and replies, and the evidence submitted by the parties, the Court concludes that Plaintiffs have failed to meet their burden of proving a substantial likelihood of success on the merits.   More specifically, there is no evidence that the product-

46

design trade dress at issue has acquired secondary meaning, and even if it has, the design features are functional and therefore cannot be protected trade dress.    Further, there is no evidence that the trademarks at issue are synonymous in the minds of the public with Sun Water or its trade name Aquasana.    Moreover, Plaintiffs failed to establish their ownership in the trademarks.    Consequently, Plaintiffs' motion (doc. #27) for a preliminary injunction is DENIED.

SIGNED February 28, 2007.


TERRY R. MEANS
UNITED STATES DISTRICT JUDGE