```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                      FORT WORTH DIVISION

SUN WATER SYSTEMS, INC.          §
                                 §
VS.                              §  CIVIL ACTION NO.4:05-CV-574-Y
                                 §
VITASALUS, INC., ET AL.          §
```

## ORDER DENYING CROSS-MOTION FOR PRELIMINARY INJUNCTION

The Court has before it a cross-motion for a preliminary injunction filed by defendants Vitasalus, Incorporated, *et al* (doc. #65). After review of the motion, response, and reply, the Court concludes that it should be DENIED because Defendants have failed to establish irreparable harm.

I.  Factual Background

This cause of action arises out of a bitter dispute between competitors in the commercial sale of a water-filtration system commonly referred to as a whole-house water treatment system ("whole-house system"). Plaintiffs allege that Defendants are infringing on their trademarks and trade dress used in the marketing and sale of the system. Defendants counter with claims that Plaintiffs have engaged in anti-competitive behavior through defamation, business disparagement, and tortious interference with contracts and prospective business relations. The Court's February 28, 2007, order denying Plaintiffs' motion for a preliminary injunction sets out in detail the history of this dispute between the parties and will not be repeated here.

Defendants' motion seeks to have the Court enjoin Plaintiffs from making certain statements aimed at defaming and disparaging Defendants' business and calculated to interfere with their current and prospective customer relations.  Specifically, Defendants complain that Plaintiffs have instructed their dealers and distributors to relay the following message in response to any customer inquiries that mention Defendants:

> Vitasalus (Equinox-Products.com) is not an authorized Aquasana or Equinox distributor.  We are currently in litigation with them for illegal use of our trademarks (Equinox and Rhino) and selling counterfeit products.
>
> They buy old and used units off the street and refurbish them.  No one has made a new Equinox or Rhino in over ten (10) years.  We purchased the manufacturing rights, patent and trademark for their product in 1999 and produce it as the Sun Water EQ-300.
>
> Buying this product from Vitasalus is risky and will most likely result in owning a product without a warranty, and of questionable quality.
>
> The EQ-300 sold by Vitasalus is not certified and the company is selling them fraudulently.

Defendants also complain of the following statements that were placed on Plaintiffs' website and on the internet:

> 1.  We are the only licensed manufacturer of this product, BEWARE OF UNCERTIFIED IMITATIONS sold as Vitasalis [sic] EQ-300 . . . ."
>
> 2.  Be wary of uncertified imitations sold as Vitasalis [sic], WE ARE THE ONLY CERTIFIED MANUFACTURER OF THIS PRODUCT!"
>
> 3.  Equinox Water Filtration products are only sold through Aquasana.com.  All products are certified and covered by factory warranty.  Beware

>of counterfit [sic] copies sold by Equinox-Products.com.
>
>4. We're the only licensed manufacturer of the Rhino EQ-300 Whole House Water Filter. Be weary [sic] of imitations sold at Equinox-Products.com. Call us before you purchase.

Defendants also complain that Plaintiffs contacted Ebay.com and Google.com and persuaded them to restrict Defendants' ability to market and sell their whole-house system using the marks "Equinox," "Rhino," and "EQ-300." In particular, Ebay.com removed two of Defendants' listings on the Ebay.com site because Plaintiffs had notified them, "under penalty of perjury," that Defendants' listing infringes on Plaintiffs rights under copyright, trademark, and other laws. Defendants' Ebay.com listing had customers bidding to purchase a whole-house system.

II. Analysis

To obtain a preliminary injunction, Defendants must clearly establish: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to Defendants outweighs any harm to Plaintiffs that may result from the injunction; and, (4) that the injunction will not undermine the public interest. *See Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990); *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989). A preliminary injunction is an extraordinary remedy, and it is well-settled law that it will only be granted if Plaintiffs clearly carry their burden of persuasion on all four factors. *Allied Mktg. Group, Inc.*, 878 F.2d at

3

809. If the Court concludes that Plaintiffs have failed to carry their burden on any one of the four factors, then the Court must deny the motion for a preliminary injunction. "The decision whether to grant a preliminary injunction is within the discretion of the district court." *Id.*

Plaintiffs argue,

> Defendants have filed the instant "cross-motion" in an attempt to offset and cloud [Plaintiffs'] pending request for preliminary relief based on clear claims of trademark infringement, trade dress infringement and unfair competition. The damages Defendants claim are *de minimis.*

The Court strongly disagrees. Defendants filed this instant motion because they believe, apparently with good reason, that many of Plaintiffs' statements are blatantly false. First, Plaintiffs stated that Defendants are not authorized to sell Equinox products and that "Equinox water filtration products are only sold through Aquasana.com-." Defendants, however, have presented the Court with evidence that establishes their substantial likelihood of proving at trial that this is clearly not true and that Plaintiffs were fully aware that this is not true.

The evidence Plaintiffs submitted in support of their own motion for a preliminary injunction included a copy of the official distributorship agreement Defendants signed with Equinox International Corporation ("EIC"). This agreement gave Defendants the right to sell and distribute Equinox products. Also, Plaintiffs were fully aware that the EIC receiver had placed the following advisement on the receiver's official internet webpage:

4

> <u>Equinox Products</u>
>
> **If you are interested in purchasing or selling products or accessories previously sold by Equinox International, please visit website http://www.equinox-products.com/** [Defendants' website]. . . .
>
> As stated in the notice of Receivership, products do not need to be returned to Equinox International in order to participate in the claims process. **Therefore, all products that are in a Representative's possession are his/her property and can be consumed, distributed, and/or disposed at their discretion.** (Emphasis added.)

That advisement not only informs that Defendants are authorized to sell Equinox products, but any other former distributer in possession of Equinox products previously purchased from EIC has the right to sell those products. Furthermore, the EIC receiver was free to sell any and all remaining inventory of Equinox products to any distributor who wished to purchase them and then resell them to the public. *See FTC, et al. v. Equinox International Corp., et al.,* No. CV-S-99-0969-JBR (RLH), Order Preliminarily Approving Stipulated Final Judgment and Class Action Settlement and Setting Fairness Hearing, at pgs. 16 & 17, ¶¶ D & G. (D.Nev. April 20, 2000). Moreover, for close to two years, Plaintiffs sold liquidated Equinox inventory they had purchased from the EIC receiver to Defendants—knowing Defendants operated a web-based business that adver-                                tised:



Second, Plaintiffs stated that Defendants were selling fraudulent and counterfeit products. Here too, Defendants have presented the Court with evidence establishing their substantial likelihood of proving at trial that this is blatantly untrue. For the reasons just stated above, Defendants do not appear to be fraudulently selling Equinox products, they appear to have every right and authorization to sell them. Furthermore, the evidence presented apparently shows that Defendants are not selling counterfeit whole-house systems. The Supreme Court has explained that

> in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying. As the Court has explained, copying is not always discouraged or disfavored by the laws which preserve our competitive economy. Allowing competitors to copy will have salutary effects in many instances.

*Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001). Plaintiffs' cause of action against Defendants does not include any claim for patent infringement. Thus, Defendants have every right, as our free-market economy premised on competition fully encourages, to manufacture the same or a substantially similar product as Plaintiffs and sell it as their own. Defendants' "only obligation" is "to identify its own product lest it be mistaken for that of the plaintiff." *Kellogg Company v. National Biscuit Company,* 305 U.S. 111, 119 (1938)(holding two companies had the right to manufacture,

market, and sell the exact same pillow-shaped breakfast cereal as shredded wheat).

The term "counterfeiting" is used almost exclusively in connection with illegal activity that includes elements of deception, defrauding, and dishonesty. When the average person hears the term "counterfeit," he will almost invariably relate that to the fraudulent and criminal printing of imitation paper money. Undoubtedly, the message conveyed by Plaintiffs is that Defendants' product is a fraudulent imitation. But Defendants' evidence demonstrates to the Court their substantial likelihood of proving that they have not perpetrated any fraud in selling their own whole-house system because, and as more fully explained in the Court's February 28 order, their website clearly distinguishes their product from that of Plaintiffs.

Third, Plaintiffs' statements that (1) Defendants buy old and used systems off the street and refurbish them; (2) no one has made a new Equinox or Rhino whole-house system in over ten years; and, (3) Plaintiffs had purchased the manufacturing rights, patent, and trademarks for Defendants' product also appear to be false. The best piece of evidence refuting Plaintiffs' first two statements is Plaintiffs' own concession that they built new systems for Defendants out of component parts Plaintiffs had purchased from the EIC receiver. These were not old and used systems that came off the street, they were brand new, and they were labeled with the marks Rhino, Equinox, and EQ-300. This was a contractual relationship that began in 2001 and ended in 2004 where Plaintiffs agreed to be a hidden manufacturing

resource for Defendants' new whole-house systems. Thus, the evidence strongly suggests that Plaintiffs knew that their claim—that no one had made a new Equinox or Rhino system in over ten years—was patently false.

Plaintiffs' claim that they purchased the patent for the whole-house system is almost surely false because there is no proof of any patent on the system. If there were, the Court is certain Plaintiffs would have brought a patent-infringement claim along with their trademark-infringement claims. And surely Plaintiffs knew that they didn't purchase the trademarks Equinox or EQ-300 because the Court prohibited the EIC receiver from conveying any proprietary rights in marks that are associated with the goodwill of EIC. *See FTC, et al. v. Equinox International Corp., et al.,* No. CV-S-99-0969-JBR (RLH), Order Preliminarily Approving Stipulated Final Judgment and Class Action Settlement and Setting Fairness Hearing, at pg. 17, ¶ G. (D.Nev. April 20, 2000).

Finally, Plaintiffs must know that their statement that buying Defendants' product "will most likely result in owning a product without a warranty" was false. Defendants' website specifically mentions the warranty that comes with their product.

Based on the forgoing, the Court is convinced that Defendants have demonstrated a substantial likelihood of establishing defamation and business disparagement by Plaintiffs at trial. To establish defamation, Defendants must show that (1) Plaintiffs published a false statement; (2) the false statement was defamatory; and, (3) Plaintiffs

8

made the statement with negligence as to its truth. *See Green v. CBS, Inc.,* 286 F.3d 281, 283 (5th Cir. 2002); *WFAA-TV v. McLemore,* 978 S.W.2d 568, 571 (Tex. 1998).

As shown above, there is little doubt that Defendants will prove at trial that Plaintiffs published false statements. And there is little doubt that Defendants will prove that Plaintiffs were fully aware of the falsity of those statements when they made them. But the Court is also convinced that Defendants will prove that the statements were defamatory.

A statement is defamatory when it tends to injure the reputation or to impeach characteristics of honesty, integrity, or virtue thereby exposing one to public hatred, contempt, ridicule, or financial injury. *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001; *Cain v. Hearst Corporation,* 878 S.W.2d 577, 580 (Tex. 1994). Defendants' have presented the Court with compelling evidence that Plaintiffs' statements injure Defendants' reputation, impugn their honesty and integrity, and exposed them to contempt and financial injury. In fact, the Court suspects that was Plaintiffs' exact intent.

Defendants have presented evidence establishing that as a result of Plaintiffs' statements, they lost potential customers. One customer inquired as to Plaintiffs' statements and, even after receiving Defendants' explanation, he withdrew his order. Another customer, even after receiving Defendants' response, never placed an order. And Ebay.com withdrew Defendants' listing, causing them to lose customers that were bidding on their products. The Court is

persuaded that Defendants will likely prove that Plaintiffs' statements impugned the integrity of the individual Defendants, casting them as shysters and thereby causing consumers to question whether they could trust any of Defendants' statements regarding their product.

To establish business disparagement, Defendants must demonstrate that (1) Plaintiffs published false and disparaging information about them; (2) Plaintiffs acted with malice; (3) Plaintiffs acted without privilege; and, (4) Defendants suffered special damages. *Forbes, Inc. v. Granada Biosciences, Inc.,* 124 S.W.3d 167, 170 (Tex. 2003). While similar in many respects to defamation, business disparagement differs in that it protects economic interests against pecuniary loss. *Id.*

To prove malice, Defendants have to show Plaintiffs knew their statements were false, acted with reckless disregard concerning the falsity of their statements, or acted with ill will or intended to interfere in Defendants' economic interests in an unprivileged fashion. *Hurlbut v. Gulf Atlantic Life Insurance Company,* 749 S.W.2d 762, 766 (Tex. 1987). Special damages are proved when Defendants

> establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales. . . . The communication must play a substantial part in inducing others not to deal with [Defendants] with the result that special damage, in the form of the loss of trade or other dealings, is established.

*Id.* at 767. Defendants have shown a substantial likelihood of proving these elements as well. Their evidence shows Plaintiffs published false and disparaging statements about Defendants. It shows Plain-

10

tiffs knew that their statements were false, that they acted with ill will in making these false statements, and that Plaintiffs intended for the statements to interfere with Defendants' ability to consummate sales of their product by scaring off any potential customers. Furthermore, Defendants have demonstrated lost sales and loss of trade directly caused by Plaintiffs' remarks.

Defendants have also established that the threatened injury to them outweighs any harm to Plaintiffs that may result from the injunction.  Clearly Plaintiffs would not be harmed by an order that directs them to stop engaging in apparently anti-competitive behavior through the making of false statements that maliciously align Defendants' reputation, honesty, and integrity.  And an injunction would not undermine the public interest.  If in fact Plaintiffs are engaging in anti-competitive behavior—as Defendants' evidence strongly suggests—an injunction would further the public interest by preventing consumers from being mislead by blatantly false statements made by a market competitor.

The shortcoming lies, however, in Defendants' failure to persuade the Court that they will suffer irreparable harm.  In their motion, Defendants state only that

> [Defendants are] suffering and will continue to suffer irreparable harm if [Plaintiffs are] not enjoined from continuing [their] anti-competitive campaign to impugn the quality and reputation of [Defendants] and [their] products. [Plaintiffs have] engaged in a pattern of accusations and disparagement of [Defendants] and [their] products through the internet, through email communications, and through communications with e-commerce businesses. Among other things, [Plaintiffs have]

11

> directly accused [Defendants] of committing fraudulent business practices and of selling products that are health and safety risks. Remarkably, [Plaintiffs have] attempted to turn the safety issue on its head by claiming that [their] reputation may be harmed; in fact, it is [Plaintiffs] [who are] harming [Dependants'] reputation by making baseless, false allegations directly accusing [Defendants] of selling unsafe products.
>
> At its core, the intent of [Plaintiffs] is clear—-to cause irreparable harm to [Defendants] in an attempt to gain leverage in its anti-competitive attack. While [Defendants have] already suffered irreparable harm, the scope of this harm will continue to expand until [Plaintiffs are] enjoined.

Simply stating that Defendants will suffer irreparable harm, and simply restating the wrongful acts of Plaintiffs is insufficient to establish irreparable harm. And simply stating that Plaintiffs intend to cause irreparable is insufficient as well. While the evidence strongly suggests that Plaintiffs intend to cause Defendants irreparable harm, the test is not whether Plaintiffs intend to cause irreparable harm, but whether they are succeeding.

In this circuit the law is clear, "only those injuries that cannot be redressed by the application of a judicial remedy after a hearing on the merits can properly justify a preliminary injunction." *Canal Authority of Florida v. Callaway,* 489 F.2d 567, 573 (5th Cir. 1974). As such, Defendants are required "to show that the loss cannot be measured in money damages." *Millennium Restaurants Group, Incorporated v. City of Dallas,* 181 F.Supp.2d 659, 666 (N.D.Tex. 2001)(Fish, J.). Simply arguing that they are losing customers and goodwill without showing that monetary damages are an inadequate

remedy is insufficient to establish irreparable harm. *See Id.* This is true even if "the pecuniary injury [is] difficult to calculate . . . ." *Id.* The loss of goodwill of a business "is usually compensable in money damages." *DFW Metro Line Services v. Southwestern Bell Telephone Company,* 901 F.2d 1267, 1269 (5th Cir. 1990). Thus, the Court concludes that "a total failure of proof as to why money damages are not measurable or adequate cannot be excused . . . ." *Pate, et al. v. The Houston Chronicle Publishing Company, et al.,* 462 F.Supp. 1114, 1118 (S.D.Tex. 1977), *aff'd,* 572 F.2d 1106 (5th Cir. 1978).

III. Conclusion

The Court concludes that, as to the statements addressed above, Defendants have demonstrated a substantial likelihood of proving their claims of defamation and business disparagement at trial. The Court also concludes that Defendants have established that their injury significantly outweighs any harm that may come to Plaintiffs from an injunction. And the Court concludes that an injunction would further the public interest. But because Defendants have wholly failed to prove irreparable harm, the Court DENIES their motion for a preliminary injunction. Further, in all other aspects not addressed in this order, the Court DENIES Defendants' request for an injunction.

SIGNED March 8, 2007.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

13